UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Precision Bioservices, Inc., d/b/a Precision for Medicine,<br><br>    Plaintiff,<br>v.<br><br>Core Informatics, LLC,<br><br>    Defendant. | *Civil Action No.  3:19-cv-1722*<br><br>NOVEMBER 1, 2019 |

# COMPLAINT

Plaintiff, Precision Bioservices, Inc., d/b/a Precision for Medicine ("Plaintiff" or "Precision"), by and through its attorneys, says by way of Complaint against Defendant, Core Informatics, LLC ("Defendant" or "Core") as follows:

## PARTIES

1.      Precision is a Maryland corporation with its principal place of business located at 2 Bethesda Metro Center, Suite 850, Bethesda, Maryland 20814.

2.      Core is a Connecticut limited liability company with its principal place of business located at 36 East Industrial Road, Branford, Connecticut 06405.

## JURISDICTION

3.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §1332 because this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interest, fees, and costs.  There is complete diversity of citizenship between the parties.

4. Venue is proper in this Court because Core's principal place of business is in this District.

## FACTS COMMON TO ALL COUNTS

**A. Precision Enters Into a Master Services Agreement And License with Core**

5. Precision is a scientific services company that provides, *inter alia*, an array of research, biorepository and advisory services to pharmaceutical and life-sciences clients.

6. As part of its biorepository operations, Precision required a fully integrated "end-to-end" data management software system ("Software") to aid in collecting, sharing, analyzing, and archiving of scientific data and workflows.

7. In 2016, Precision undertook steps to identify and solicit proposals for such Software.

8. In or around August 2016, Core submitted a proposal to Precision to provide a solution to meet Precision's Software needs (the "Proposal").

9. As part of the Proposal, Core represented to Precision that Core's "Platform for Science" (particularly the "Thermo Scientific Core LIMS" program) (hereinafter the "PFS") could satisfy Precision's need for a fully integrated Software system for Precision's "Next Generation Laboratory."

10. After receiving the Proposal, Precision conducted testing on a "demo" of the PFS.

11. After testing the "demo," on September 22, 2016, Precision produced a "LIMS Gap Analysis" (the "Gap Analysis") of the PFS.

12. The Gap Analysis identified numerous functionality "gaps" in the PFS.

13. Specifically, the Gap Analysis demonstrated that the PFS could not meet Precision's Software needs unless Precision invested substantial resources to configure the PFS with Precision's existing systems.

14. The Gap Analysis further recommended Precision engage a "second vendor" for the desired Software solution.

15. On September 25, 2016, Core provided Precision a "point-for-point" functionality analysis in response to the Gap Analysis (the "Response").

16. In the Response, Core stated that it was capable of configuring the PFS to eliminate functionality "gaps."

17. Core further represented that Precision would incur lower professional service costs by engaging Core for the PFS as compared to a competitor's product and services.

18. On December 29, 2016, in reliance on Core's representations, Precision and Core entered into a Master Services Agreement and License (the "MSA").

19. But for Core's Response and related representations, Precision would not have engaged Core and entered the MSA.

**B. The PFS Fails To Perform As Represented by Core**

20. After execution of the MSA, Core began configuring and implementing the PFS in early 2017.

21. Due to issues that arose during "User Acceptance Testing," full implementation onto Precision's systems did not occur until August 2017.

22. Precision began experiencing problems with the PFS immediately upon its use.

23. The PFS was defective, failed to perform as represented, and was incapable of satisfying Precision's Software needs.

24. On multiple occasions, Precision made written and verbal requests demanding that Core remedy the systemic and configuration defects in the PFS.

25. In response, Core represented that it could remedy the PFS defects if Precision purchased additional support services (through Statements of Work, purchase orders, and/or change orders) from Core.

26. In reliance on Core's representations, Precision paid additional sums for the professional services recommended by Core to correct the defects.

27. Despite the additional payments, Core was incapable of configuring the PFS to correct the functionality defects.

28. The PFS's defects cumulatively rendered the PFS unusable by Precision throughout the duration of its license as the PFS was incapable of performing as the Software solution that Precision required.

29. As of September 2019, Precision has paid Core $508,380.00 for the PFS.

30. Specifically, Precision has paid Core $344,005.00 for the licensing of the PFS and an additional $164,375.00 for "professional services."

31. On September 10, 2019, Precision rescinded the MSA, Statements of Work, and any other agreements between the parties.

32. Precisions also demanded a full refund from Core for the licensing and professional services payments in the amount of $508,380.00.

33. To date, Core has failed and refused to provide Precision a refund.

## FIRST COUNT

## NEGLIGENT MISREPRESENTATION

34. Precision repeats and realleges each and every preceding allegation as if set forth fully herein.

35. Core represented to Precision that the PFS would satisfy Precision's need for a fully integrated "end-to-end" data management platform.

36. Core further represented to Precision that it could configure the PFS to eliminate functionality defects ("gaps") and ensured Precision that it would obtain the benefits of the PFS.

37. At the time that it made the representations, Core knew or should have known that the representations were false.

38. Precision relied upon Core's representations in entering the MSA and all subsequent Statements of Work, change orders, and/or purchase orders.

39. Precision would not have entered the MSA and all subsequent Statements of Work, change orders, and/or purchase orders, but for Core's representations.

40. Precision's reliance on Core's representations was reasonable and justifiable.

41. As a direct and proximate result of Core's statements, Precision has and will continue to suffer damages.

## SECOND COUNT

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE PURSUANT TO CONNECTICUT GENERAL STATUES § 42a-2-315

42. Precision repeats and re-alleges each and every preceding allegation as if fully set forth herein.

43. Precision required Software to serve as a fully integrated "end-to-end" data management platform to manage its voluminous data and workflows.

44. Core was aware of Precision's requirements.

45. With that knowledge, Core represented to Precision that (a) the PFS was capable of meeting Precision's requirements by serving as a fully integrated "end-to-end" data management platform, and (b) that Core was capable of configuring the PFS to address any functionality defects identified by the Gap Analysis.

46. Precision relied upon Core's skill, judgment, and representations as to the PFS's functionality.

47. Precision further relied upon Core's representations that it was able to configure the PFS to fix any functionality defects.

48. Core failed to correct defects in the PFS to satisfy Precision's Software needs.

49. As a result of Core's actions, Precision has and will continue to suffer damages.

## THIRD COUNT

## BREACH OF CONTRACT

50. Precision repeats and realleges each and every preceding allegation as if set forth fully herein.

51. The MSA, Statements of Work, change orders, and purchase orders, are valid and enforceable contracts.

52. Precision performed all material obligations under these contracts by paying Core $508,380.00 for the PFS license and for Core's professional services.

53. The PFS was defective and failed to satisfy Precision's Software needs.

54. Further, Core failed to properly configure, and or correct, defects in the PFS to ensure its functionality for Precision's use.

55. As a result of Core's breaches of the MSA and Statements of Work, Precision has suffered damages in the amount of $508,380.00.

## FOURTH COUNT

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

56. Precision repeats and realleges each and every preceding allegation as if set forth fully herein.

57. The MSA, Statements of Work, change orders, and purchase orders, are valid and enforceable contracts.

58. There is, in all contracts, an implied covenant of good faith and fair dealing.

59. Core, by entering the MSA, Statements of Work, purchase orders, and change orders with Precision, and accepting Precision's payments in relation to same, had implied in its contracts and dealings with Precision a duty of good faith and fair dealing.

60. Core, by failing to deliver functional PFS software, and by failing to and/or being incapable of remedying the PFS defects, has breached the implied duty of good faith and fair dealing.

61. As a result of Core's actions and/or inactions, Precision has and will continue to suffer damages.

## FIFTH COUNT

## UNJUST ENRICHMENT

62. Precision repeats and realleges each and every preceding allegation as if set forth fully herein.

63. Precision provided good and valuable consideration to Core by providing payment in connection with license of the PFS and related professional services.

64. Core accepted and received Precision's payments of $508,380.00.

65. The PFS that Core provided to Precision was defective.

66. Further, Core failed to and/or refused to provide the necessary professional services to ensure the PFS functionality—despite repeated demands for same by Precision.

67. By receiving and retaining Precision's payments and failing to provide Precision a functional PFS, Core has been unjustly enriched.

68. As a result, Precision has and will continue to sustain damages.

## SIXTH COUNT

**VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT PURSUANT TO CONNECTICUT GENERAL STATUES § 42a-110a, *et seq.***

69. Precision repeats and realleges each and every preceding allegation as if set forth fully herein.

70. Core is a "person" within the meaning of the Connecticut Unfair Trade Practices Act ("CUTPA") and engaged in "trade" and "commerce" within the meaning to the CUTPA.

71. As alleged herein, Core represented to Precision that (a) the PFS was capable of meeting Precision's requirements by serving as a fully integrated "end-to-end" data management platform, and (b) that Core was capable of configuring the PFS to address any functionality defects.

72. Core's representations were false and constitute unfair or deceptive acts or practices in the conduct of trade and commerce within the meaning of the CUTPA (C.G.S. § 42-110a *et seq.*) as same offends the public policy of the State of Connecticut and is immoral, unethical, unscrupulous, and deceptive.

73. Moreover, in failing to provide a working PFS, and failing to properly configure, and/or correct, defects in the PFS, Core, in bad faith and without justification, breached the MSA, Statements of Work, change orders, and purchase orders.

74. Such bad faith breaches of the MSA, Statements of Work, change orders, and purchase orders, constitute aggravating circumstances.

75. As a result of Core's actions, Precision has suffered an ascertainable loss of money.

76. As described above, Core engaged in its actions willfully, intentionally, knowingly and it demonstrates calculated, deceitful, and unfair conduct, and reckless indifference to Precision's rights. Accordingly, Precision is entitled to punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

77. Pursuant to Conn. Gen. Stat. § 42-110g(c), upon commencement of this action, Precision gave due notice of its claims to the Attorney General and the Commissioner of Consumer Protection for the State of Connecticut.

## **PRAYERS FOR RELIEF**

**WHEREFORE**, Precision respectfully requests that the Court enter judgment against Core as follows:

1. Declaring the MSA, Statements of Work, and any other agreements between Precision and Core *void ab initio*;

2. Compensatory Damages;

3. Consequential Damages;

4. Punitive Damages, including but not limited to treble damages, available at law and pursuant to Conn. Gen. Stat. § 42-110g(a);

5. Interest;

6. Attorneys' Fees available at law and pursuant to Conn. Gen. Stat. § 42-110g(d);

7. Costs; and

8. Such other relief as the Court may deem appropriate.

**PLAINTIFF**,
Precision Bioservices, Inc., d/b/a Precision for Medicine

By: /s/ Glenn M. Cunningham
Glenn M. Cunningham (ct09995)
John J. DiMarco (ct29540)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel: (860) 251-5000
Fax: (860) 251-5218

Christian J. Jensen (*pro hac vice forthcoming*)
Sean Rose (*pro hac vice forthcoming*)
OLENDERFELDMAN LLP
422 Morris Ave.
Summit, New Jersey 07901
Tel: (908) 964-2446
Fax: (908) 810-6631
srose@olenderfeldman.com
cjensen@olenderfeldman.com

*Attorneys for Plaintiff*